Aksana M. Coone, Esq. (SBN 190125)
LAW OFFICES OF AKSANA M. COONE
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 556-9650
Facsimile: (310) 954-9008
Email: aksana@coonelaw.com

Attorneys for Plaintiff,
MADAN PARSEKAR

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MADAN PARSEKAR

Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES LTD,

Defendant.

**Case No.: 2:18-cv-00283**

**COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES AND MAINTENANCE AND CURE; AND DEMAND FOR JURY TRIAL**

COMES NOW the plaintiff, MADAN PARSEKAR (hereinafter "Plaintiff") and for a cause of action against Defendant ROYAL CARIBBEAN CRUISES LTD., (hereinafter "RCCL" or "Defendant") complains and alleges as follows:

## JURISDICTION AND VENUE

1. This is an action for personal injuries under the Jones Act, 46 U.S.C. §3104 and the general maritime law between citizens of different States seeking damages in excess of $75,000.00 (Seventy-Five Thousand Dollars), exclusive of costs, attorneys' fees and interest.

2. Federal subject matter jurisdiction exists under 28 U.S.C. § 1331 and by virtue of diversity citizenship pursuant to 28 U.S.C. § 1332. The action also arises under maritime law such that the Court has admiralty jurisdiction under 28 U.S.C. § 1333 and the general maritime law of the United States.

3. Venue is proper in this District pursuant to 28 U.S.C § 1391(b) because Defendant RCCL was and is doing business within the State of California and is subject to the jurisdiction of this Honorable Court.

**THE PARTIES**

4. At all times material hereto, Plaintiff was a citizen of India and employed as a seaman, working for Defendant RCCL for over 14 years as a waiter aboard its various cruise ships, including RCCL's vessel the *Freedom of the Seas*.

5. At all times material hereto, Defendant RCCL was a foreign, Liberian-registered corporation engaged in the business of marketing, selling and operating global cruise brands, including Royal Caribbean International, out of various ports within the continental United States, including Los Angeles, California.

6. At all times materials hereto, the Defendant RCCL owned, operated, managed and/or controlled the *Freedom of the Seas* and was the Jones Act employer of the Plaintiff.

**GENERAL ALLEGATIONS COMMON TO ALL COUNTS**

**Status of Parties**

7. At all times material hereto, Plaintiff was a seaman under the Jones Act, since the Defendant RCCL maintained its base of operations in the United States, the Defendant RCCL was publicly traded on the New York Stock Exchange and was owned in substantial part by U.S. citizens and investors, an extremely substantial amount of the Defendant's revenue is derived by its operations in the United States and through the sale of cruise tickets to U.S. passengers, and the Defendant's vessel upon which the Plaintiff was employed was based in Florida

and regularly sailed out of U.S. ports as did the majority of the Defendant's fleet, in addition to other contacts with the United States.

8. As a Jones Act seaman, the Plaintiff is entitled to the federal statutory remedies set forth in the Jones Act, 46 U.S.C. §3104 and the Federal Employers Liability Act, 45 U.S.C. §51 *et seq*. incorporated therein by reference as well as the remedies guaranteed by the United States Supreme Court set forth as part of the general maritime law for seamen, including but not limited to maintenance and cure.

**Medical Treatment Provided by Defendant's Doctors**

9. On or about January 11, 2015, Plaintiff suffered from abdominal pain and distention while working as a seaman aboard RCCL's vessel *Freedom of the Seas*. After reporting these complaints to the ship's medical center, Plaintiff was medically disembarked and sent by the ship to a medical facility in the Bahamas where the ship was docked and where he was treated by physicians selected, hired, and based on information and belief, routinely used by Defendant pursuant to its maintenance and cure obligations.

10. On or about January 14, 2015, upon worsening of his condition and the onset of a respiratory failure, Plaintiff was transferred to Broward Health Medical Center in Fort Lauderdale, Florida (hereinafter "BHMC") to be treated by their shore side physicians, selected, hired and regularly used by the Defendant in Florida.

11. While under the care of BHMC physicians, Plaintiff was diagnosed among other conditions with acute necrotizing pancreatitis, respiratory failure requiring intubation, pseudocyst for which surgery was recommended and ICU psychosis requiring sedation.

12. On or about February 11, 2015, the BHMC physicians determined Plaintiff was at a high risk for DVT and that prophylactic anticoagulation was not possible due to alleged gastrointestinal bleeding and ordered the placement of a

Denali retrievable inferior vena cava filter ("IVC filter"). An IVC filter is a medical device that is implanted into the inferior vena cava vein to presumably prevent life-threatening pulmonary emboli. The consent for the procedure was allegedly obtained telephonically from Plaintiff's spouse in India.

13. On or about February 17, 2015, RCCL arranged for Plaintiff's spouse to travel to the U.S. and assist Plaintiff. Upon discussions with the BHMC physicians, Plaintiff and his spouse decided that Plaintiff will undergo the recommended pseudocyst surgery in his home country, India. Plaintiff was discharged from BHMC on March 20, 2015. RCCL's crew medical team arranged for Plaintiff's further medical care in India through their medical agent Indus Medical Centre and other physicians selected, hired and routinely used by Defendant pursuant to its maintenance and cure obligations.

14. From February 11, 2015 until his discharge from BHMC on March 20, 2015, Plaintiff was never advised by RCCL or the BHMC doctors it hired that an IVC filter was implanted in his body and that he will require further care, management, monitoring and/or treatment due to such placement, including retrieval of the device as soon as possible after it is no longer medically necessary.

15. On or about March 21, 2015, Plaintiff arrived in India and was transported and admitted to Vision Multispecialty Hospital in Goa, India. On March 30, 2015, Plaintiff underwent a cyst gastrostomy, the recommended surgery for his pseudocyst and was discharged on April 11, 2015.

16. On or about April 13, 2015, Plaintiff complained of severe abdominal pain and was readmitted to the hospital where he was diagnosed with intestinal obstruction and underwent a transverse loop colostomy surgery on or about April 25, 2015. He was discharged from the hospital on May 12, 2015.

17. Throughout his medical admission and treatment at the Vision Multispecialty Hospital under the supervision, control and monitoring of

RCCL's crew medical team and its medical agents in India, Plaintiff was never advised that he will require further monitoring and/or treatment relating to the IVC filter in his body or the need to retrieve it as soon as possible after its medical need was resolved.

18. On or about August 1, 2015, Plaintiff underwent a follow up CT Scan of his abdomen, the report of which noted an "IVC filter is seen in the infra renal IVC." In reviewing this report with his surgeon, Plaintiff for the first time discussed with a physician the fact that the IVC was implanted in his body. The surgeon recommended Plaintiff consult with a vascular surgeon regarding management of the IVC filter.

19. RCCL's medical agent, Indus Medical Centre, arranged for Plaintiff to consult with vascular surgeon, Dr. Irineu Pereira, on August 13, 2015. Dr. Pereira questioned why the IVC filter was implanted in the first instance and opined that due to the passage of time, six months since implantation, the risks of attempting to retrieve the IVC filter were serious and complicated and such risks outweighed the benefits. Dr. Pereira instead prescribed a regiment of baby Aspirin for the remainder of Plaintiff's life.

20. On or about February 8, 2016, Plaintiff underwent another surgery for the closure of the colostomy. In the following four months, Plaintiff underwent orthopedic care for joint pains. On July 12, 2016, Plaintiff was declared fit for shipboard duty by his orthopedic doctor. On July 16, 2016, Plaintiff was declared fit for shipboard duty by his surgeon. On July 27, 2016, Indus Medical Centre's doctor in Mumbai, India who has never once seen or examined Plaintiff issued a report finding Plaintiff has reached maximum medical improvement ("MMI") and was able to return to regular employment with no restrictions.

21. Plaintiff attempted to return to his former employment with RCCL, but was advised by its medical Case Manager on September 8, 2016 that RCCL's medical team has determined Plaintiff is not fit for duty as he will require to be

in close proximity to medical providers. Plaintiff's efforts to ascertain the basis for such decision and what medical care RCCL deemed required closer medical services were dismissed and unanswered.

22. In a willful and wanton disregard of its maintenance and cure obligations, RCCL's September 8, 2016 correspondence advised Plaintiff that based on the Indian physicians' MMI reports, RCCL has terminated Plaintiff's maintenance and cure benefits, while simultaneously concluding he will not be rehired because he will require the closer support of medical providers for further unidentified medical care. Prior to termination of his maintenance benefit, Plaintiff received a $12.00 daily maintenance stipend.

**IVC Filter Complications and FDA Warnings**

23. As early as 2010 the U.S. Food and Drug Administration ("FDA") has publicly recognized the dangers of IVC filters that tend to fracture, perforate, migrate and tilt in the patients in which they were implanted. In an August 9, 2010 Initial Communication, the FDA warned physicians that since 2005 it has received 921 device adverse event reports involving IVC filters including instances of device migration, embolization, perforation of the IVC and filter fracture. The FDA stated it was concerned that "these retrievable IVC filters, intended for short-term placement, are not always removed once a patient's risk for PE [pulmonary embolism] subsides. Known long term risks associated with IVC filters include but are not limited to lower limb deep vain thrombosis (DVT), filter fracture, filter migration, filter embolization and IVC perforation." Due to these concerns, the FDA recommended "all physicians involved in the treatment and follow-up of IVC filter recipients to consider the risks and benefits of filter removal for each patient. If a patient has a retrievable IVC filter that should be removed based on his or her individual risk/benefit profile, the primary care physician and/or those providing ongoing patient care should refer the patient for IVC filter removal when feasible and clinically indicated."

24. On May 6, 2014, the FDA issued an updated safety communication concerning removing retrievable IVC filters directed to physicians who implant IVC filters and clinicians responsible for the ongoing care of patients. In its warning, the FDA noted it developed a quantitative decision analysis to assess whether there is a time period during which the risk of having an IVC filter in place is expected to outweigh the benefits. The decision analysis was published in the Journal of Vascular Surgery in October 2013 and concluded that "if the patient's transient risk for pulmonary embolism has passed, the risk/benefit profile begins to favor removal of the IVC filter between 29 and 54 days after implantation." Based on these findings, the FDA recommended physicians responsible for the ongoing care of patients with retrievable IVC filters consider removing the filter as soon as protection from pulmonary embolism is no longer needed and that "a patient should be referred for IVC filter removal when the risk/benefit profile favors removal and the procedure is feasible given the patient's health status."

25. The FDA warned that a retrievable IVC filter, like the one implanted in Plaintiff, should be removed within 1 to 2 months. The longer the device remains in the body, the greater the harm it causes, as the device deteriorates and its fragmented pieces travel in the bloodstream straight to the heart or lungs puncturing organs and causing other potentially life-threating injuries. Because of these risks that endanger the lifelong health and safety of patients and the flawed design, the device has earned the moniker "deadly missiles." There are presently two Multidistrict Litigation actions pending against Bard, the manufacturer of the Denali IVC filter implanted in Plaintiff, as well as another manufacturer of IVC filters consisting of nearly 7,000 actions throughout the United States due to the thousands of patients that have been severely harmed by physicians failing to timely remove such retrievable IVC filters.

/ / /

26. The information pamphlet of the Denali IVC filter implanted in Plaintiff specifically notes "FDA recommends that implanting physicians and doctors responsible for ongoing care of patients with vena cava filters, consider removing the filter as soon as protection from pulmonary embolism is no longer needed."

27. On or about January 8, 2018, Plaintiff consulted with Dr. Dhanesh Kamerkar, a vascular surgeon and the head of the vascular an endovascular surgery department at Ruby Hall Hospital in Pune, India, with regards to management of his IVC. Following a CT Venography, Dr. Kamerkar determined that the IVC filter cannot be removed as its prongs are embedded in the IVC vein wall and efforts to retrieve the filter could result in an IVC vein tear, which is life threatening. He further opined that the risks of leaving the IVC filter in place include IVC laceration, filter occlusion, filter strut perforation, filter migration, inability to retrieve the filter, pulmonary embolism, and if the IVC suffers a tear, an emergency high risk surgery, including the risk of death, would be necessary. The physician recommended regular monitoring through CT Venography and emergency monitoring upon developing certain symptoms, as well as life long Aspirin regiment and potentially anti-coagulation medications which would require medical monitoring. Dr. Kamerkar report dated January 9, 2018 is attached hereto as Exhibit "A."

28. RCCL and its hired physicians ignored the multiple warnings provided by the FDA and the manufacture of the IVC filter to remove the retrievable filter after the transient condition for which it was used has subsided. Instead, the device was left in Plaintiff's body with no warnings, instruction, or plans made or discussed for his future care and monitoring. Throughout Plaintiff's medical care and up until his MMI finding and termination of maintenance and cure benefits, RCCL negligently monitored, supervised and directed Plaintiff's medical care, subjecting him to lifelong risks of known medical complications and death.

29. As a proximate result of these new and/or enhanced injuries resulting from the negligence and medical malpractice of the Defendant's physicians and health care providers, and RCCL's own negligence in hiring negligent physicians and relying on their opinions, and negligently monitoring, supervising, controlling and directing Plaintiff's medical care, Plaintiff has suffered permanent and continuous injuries, disability and impairment because a defective and unreasonably dangerous implant with an established record of causing injury and death was left in his body, has suffered and will continue to suffer past and future medical expenses, significant past and future pain, suffering, emotional distress, loss of enjoyment of life, psychological trauma, mental anguish, anxiety, aggravation of an existing condition, lost wages, loss of earning capacity, and will require further lifelong medical care, treatment and medical monitoring and will incur medical expenses in the care and treatment of his injuries.

30. As set forth by the Fifth Circuit Court of Appeal in *Central Gulf Steamship Corporation v. Sambula*, 405 F.2d 291 (5th Cir. 1968), the "Jones Act gives a seaman a cause of action" for the negligent provision of medical cure by a shoreside doctor selected by his or her employer to fulfill its maintenance and cure obligation and makes the employer vicariously liable for such negligence. A shipowner is liable under "strict vicarious liability for the negligence of those it employs to provide medical treatment for its injured employees." *SeaRiver Mar., Inc. v. Indus. Med. Servs., Inc.*, 983 F. Supp. 1287, 1299 (N.D. Cal. 1997).

**COUNT I: JONES ACT NEGLIGENCE – FAILURE TO PROVIDE PROMPT AND ADEQUATE MEDICAL CARE**

31. Plaintiff re-alleges paragraphs 1 through 30, and incorporates the same as a part hereof as though fully set forth herein.

32. As a result of Plaintiff's status as a seaman and Defendant's relationship to Plaintiff as his employer, Defendant owed Plaintiff the absolute and nondelegable duty to provide him with prompt and adequate medical care for any

illness and/or injury he suffered, or which was aggravated, while in service of RCCL's vessel(s) in a non-negligent manner.

33. Under the Jones Act, the Defendant RCCL is vicariously liable for the negligence of all of the doctors, nurses, hospitals and health care providers it selected to treat the Plaintiff, including the doctors at BHMC in the United States and Vision Multispecialty Hospital and Indus Medical Centere in India. RCCL is also liable for any medical providers that its agent, including Indus Medical Centere selected on RCCL's behalf to provide Plaintiff with medical care in India.

34. Plaintiff was sent by RCCL to seek medical care treatment at BHMC and Vision Multispecialty Hospital in Goa, India, which were medical facilities and providers that RCCL chose to treat Plaintiff pursuant to its maintenance and cure obligation.

35. On or about February 11, 2015, Plaintiff was implanted with a retrievable IVC filter at BHMC, the consent for which was purportedly obtained from Plaintiff's spouse who resides in India, telephonically.

36. On or about February 11, 2015 through March 20, 2015 upon Plaintiff's discharge from BHMC, the BHMC physicians were negligent in failing to retrieve the IVC filter, or alternatively, to instruct, arrange for and warn Plaintiff of the need to schedule the filter's removal as soon as medically feasible upon his return to India.

37. By implanting the IVC filter, a known dangerous and defective product intended only for temporary use, and failing to remove it promptly after its medical need subsided and to properly follow up and monitor Plaintiff's condition following the device implantation, the BHMC physicians acted below the acceptable standard of care and proximately caused severe exacerbation of Plaintiff's health and safety and proximately caused both enhanced and additional injuries, disabilities and conditions which are and will remain

permanent and continuing in nature.

38. The BHMC physicians were further negligent by failing to properly inform the Plaintiff of the risks of the procedure that was performed on him and the risks of the implanted device and obtaining a proper informed consent to perform the procedure.

39. The physicians at Vision Multispecialty Hospital, Indus Medical Centere and other physicians in India to which RCCL sent Plaintiff for medical care pursuant to its maintenance and cure obligations, were negligent and acted below the standard of care by failing to remove the IVC filter when it was no longer medically required to be implanted in Plaintiff's body. The physicians were further negligent in failing to follow up on and monitor Plaintiff's condition to evaluate the status of his IVC filter implant, conduct the proper tests, and provide proper life care plan for medical care and monitoring once the IVC filter was deemed to be irremovable.

40. RCCL has negligently failed and continues to fail to provide Plaintiff with prompt and adequate medical care and treatment in regard to all his physical and medical conditions, as set forth above and including in the following ways:

a. Selecting and hiring negligent medical providers who were incompetent, insufficiently trained and/or not current on appropriate medical standards to provide Plaintiff with prompt and adequate medical care;
b. Relying on medical opinions of negligent medical providers;
c. Relying on medical opinions of physicians who did not examine and/or evaluate Plaintiff and his medical conditions;
d. Failing to properly manage, monitor and direct Plaintiff's medical care;
e. Failing to properly and promptly assess and diagnose Plaintiff's conditions;

f. Failing to perform necessary scans, tests and examinations to determine the nature and extent of Plaintiff's condition;

g. Failing to properly treat Plaintiff and follow appropriate guidelines;

h. Failing to obtain consultations with appropriate specialists;

i. Failing to warn Plaintiff of the dangers of IVC filters;

j. Failing to provide Plaintiff with the proper follow up care, treatment, and monitoring including follow up care for the IVC filter and scheduling of its removal;

k. Failing to provide necessary medical care, therapy, monitoring and medications;

l. Failing to arrange for a lifelong care plan for his permanent injuries following the determination that the IVC filter cannot be removed;

m. Deviating from the standard of care for patients in Plaintiff's condition and for the procedures he was required to undergo;

n. By breaching the prevailing professional standard of care for said health care providers, to wit: that level of care, skill and treatment which, in light of all relevant surrounding circumstances as recognized as acceptable and appropriate by a reasonably prudent similar health care provider; and/or

o. In other manners expected to be discovered during the course of ongoing investigation and discovery.

41. As a proximate result of the above described negligence and the new and/or enhanced injuries resulting from the negligence and medical malpractice of the Defendant's physicians and health care providers, and RCCL's own direct negligence in monitoring, supervising, controlling and directing Plaintiff's medical care and selecting and hiring his treating physicians, Plaintiff has suffered permanent and continuous injuries, disability and impairment because a defective and unreasonably dangerous implant with an established record of

causing injury and death was left in his body, has suffered and will continue to suffer past and future medical expenses, significant past and future pain, suffering, emotional distress, loss of enjoyment of life, psychological trauma, mental anguish, anxiety, aggravation of an existing condition, lost wages, loss of earning capacity, and will require further lifelong medical care, treatment and monitoring and will incur medical expenses in the care and treatment of his injuries. Plaintiff alleges such damages herein, including the cost of the past and future medical care and treatment and the loss of earnings according to proof at trial.

**COUNT II: DEMAND FOR MAINTENANCE AND CURE**

42. Plaintiff re-alleges paragraphs 1 through 41, and incorporates the same as a part hereof as though fully set forth herein.

43. The general maritime law imposes on a ship and its owners the duty to provide vessel employees with maintenance and cure. *Cortes v. Baltimore Insular Lines*, 287 U.S. 367, 371 (1932). The duty of maintenance and cure concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship. *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 407–08 (2009) (citing *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441). The duty extends from the period when the seaman is incapacitated until he reaches "maximal medical recovery." *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962). Courts sitting in admiralty interpret this duty liberally, and all doubts are resolved in favor of the seaman. *Id.* at 531–32. The duty to provide maintenance and cure is not "restricted to those cases where the seaman's employment is the cause of the injury or illness." *Calmar S.S. Corp. v. Taylo*r, 303 U.S. 525, 528–29 (1938).

44. Plaintiff suffered an illness while working aboard *Freedom of the Seas*, RCCL's vessel, and while in the service of the vessel.

/ / /

45. Plaintiff suffered a new harm caused by and in the course of Defendant's negligent provision of its cure obligation. A seaman developing a new injury while receiving maintenance and cure is deemed in the "service of the vessel" and is entitled to maintenance and cure benefits for the new injury or illness. RCCL is therefore also liable for and must provide maintenance and cure benefits in connection with the improper retention of a retrievable and temporary IVC filter in Plaintiff's body that will now cause permanent and lifelong disabilities.

46. On or about September 8, 2016, Defendant concluded Plaintiff has reached MMI, improperly relying on a medical provider who has never seen or examined Plaintiff and who has not considered the implication of the presence of a lifelong disability due to the retained IVC filter in Plaintiff's body. Defendant has reached such conclusion despite also denying Plaintiff's request for reemployment based on its conclusion that Plaintiff will require medical care in close proximity.

47. A determination to terminate a seaman's right to maintenance and cure must be unequivocal. *Johnson v. Marlin Drilling Co*., 893 F.2d 77, 79 (5th Cir. 1990). Payments may be terminated when it is determined that the seaman has reached maximum medical cure when "it appears probable that further treatment will result in no betterment of the seaman's condition." *Id.* "When there are conflicting diagnoses and prognoses from various physicians, there is a question of fact to be determined by the trier of fact as to a plaintiff's entitlement to maintenance and cure benefits and as to whether an employer's termination of maintenance and cure benefits was arbitrary or capricious." *Bland v. Omega Protein Inc*. 2016 WL 280403, at *4 (W.D. La. Jan. 21, 2016).

48. Dr. Kamerkar has determined that Plaintiff requires further medical care and monitoring which is life-saving and reasonably necessary. Plaintiff has not yet reached Maximum Medical Improvement and RCCL's decision to terminate

maintenance and cure benefits based on inaccurate and incomplete information was unreasonable.

49. Accordingly, Plaintiff is hereby demanding RCCL immediately reinstate his maintenance and cure benefits and reimburse Plaintiff for his medical examination with Dr. Kamerkar and related expenses incurred by Plaintiff. In the event RCCL refuses to reinstate these benefits, Plaintiff will seek to amend the Complaint to allege a willful and arbitrary failure to provide maintenance and cure benefits and will seek punitive damages pursuant to the holdings of the United States Supreme Court in *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404 (2009).

**PRAYER**

WHEREFORE, Plaintiff MADAN PARSEKAR prays for damages against Defendant RCCL as follows:

1. For general damages according to proof;
2. For medical expenses, past and future according to proof;
3. For loss of earnings and earning capacity, past and future, according to proof;
4. For past and future maintenance and cure;
5. For attorney fees, according to proof;
6. For prejudgment interest;
7. For costs of suit; and
8. For such other and further relief as the Court may deem just and proper.

Dated: January 11, 2018 **LAW OFFICES OF AKSANA M. COONE**

By: /S/ Aksana M. Coone
Aksana M. Coone, Esq.
Attorneys for Plaintiff,
MADAN PARSEKAR

**DEMAND FOR JURY TRIAL**

Plaintiff, MADAN PARSEKAR, hereby demands trial by jury of the above-captioned matter.

Dated: January 11, 2018

**LAW OFFICES OF AKSANA M. COONE**

By: */S/* Aksana M. Coone
Aksana M. Coone, Esq.
Attorneys for Plaintiff,
MADAN PARSEKAR

# EXHIBIT A

Grant Medical Foundation
Ruby Hall Clinic

NABH
National Accreditation Board For Hospitals & Healthcare Providers

40, Sassoon Road, Pune - 411 001 (INDIA). Tel. : 020 - 6645 5100 (60 Lines), 2616 3391 (8 Lines)
Fax : 020 - 2616 4529 • E-mail : info@rubyhall.com • Website : www.rubyhall.com

**Dr. Dhanesh Kamerkar**
M.S./FVSI
Reg. No. 53739
Certified Vascular Surgeon
(Royal College of Surgeons of England)
Head,
Department Of Vascular Endovascular Surgery

Mobile No. : 9822041808

OPD Days : Monday 11 am - 2 pm
Thursday 2 pm - 5 pm

**Dr. N. R. Purandare**
M.S.
Associate Surgeon
Mob. No. : 98221 71301

• Dept. Of Vascular & Endovascular Surgery

• E-mail : pmrf@giaspno01.vsnl.net.in
dhaneshkamerkar@gmail.com

Mon. - Sat. : 10 am - 4 pm
(For appointments & emergency visits)

• For Appointments :
Mobile : 9823010275
Tel / Fax : 020 - 66455140

Date : 09/01/2018

# TO WHOMSOEVER IT MAY CONCERN

Mr. Madan Parsekar had a history of acute pancreatitis and ARDS, admitted on 14/01/2015 at Broward health Center , Miami, USA.

Patient had retrievable IVC Filter (Denali BARD, retrievable period within one year) for DVT prophylaxis in view of bleeding tendency.

Patient underwent subsequent laprotomies. Patient came to me for IVC Filter Removal.

After 2 years IVC Filter can not be removed. CT Venography of this patient shows that some of the prongs of IVC Filter are embedded in the IVC wall. With this it will be difficult to remove filter as there is increased risk of IVC tear.

Risk of leaving IVC filter in situ are IVC laceration, Filter occlusion, Filter Strut perforation, Filter Migration, inability to retrieve filter , minor PE and if he presents with IVC tear, emergency surgery would be high risk including risk to life.

It would need a regular monitoring by doing possibly a CT Venography every 2-3 years or SOS on developing symptoms.

As there was no DVT in past probably it would be sufficed to take tablet Ecosprin life long but In case if he develops Filter Thrombosis or IVC Thrombosis he would need anti coagulation which would be again life long.

Life long anti coagulation would need monitoring of coagulation parameters.

Filter should have been retrieved within a year after his then current illness had been resolved.

Dr. D. R. KAMERKAR
Consultant Vascular &
Endovascular Surgeon